UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK SALISBURY, | ) | |
| | ) | Case No. 07 C 5023 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Arlander Keys |
| | ) | |
| JOHN E POTTER, Postmaster | ) | |
| General of the United States | ) | |
| Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Patrick Salisbury began working for the United States Postal Service in 1995. He started as a mail carrier in Arlington Heights, then transferred to Joliet, where he began as a carrier and then switched over to the clerk craft. He started as a "PTF" – part time flexible – employee,[1] meaning that he had no regular set schedule and no regular or "bid" assignment.[2] Some time in 1998 or 1999, he became a regular employee – that is, one who works regularly scheduled, 40-hour work weeks and has regularly scheduled days off. From that time until 2003, Mr. Salisbury had a bid assignment at the Joliet post office.

In January 2003, the Postal Service determined that it had too many clerks at the Joliet facility and "excessed" a number of

---

[1]PTFs are a supplemental workforce; they are not guaranteed 40 hours, but are brought in on an as-needed basis, depending on the workload. *See* Bassi Dep., p. 15.

[2]A "bid is a set of defined duties assigned to a regular employee.

clerks; Mr Salisbury was one of the clerks who lost his bid, becoming an "unassigned regular" – a regular employee without a bid assignment.

After losing his bid, Mr. Salisbury drafted a written proposal trying to persuade the Postal Service to post another bid assignment for a regular employee. On June 6, 2003, Mr. Salisbury submitted a proposal regarding the replacement of one of the current unassigned bids, ostensibly to alleviate excessive use of PTFs and overtime at the Joliet main post office. *See* Defendant's Rule 56.1 Statement, Exhibit I. According to Mr. Salisbury's proposal, replacing this unassigned bid would provide management with "greater coverage for Bulk Mail in the absence of the full time Bulk Mail Clerk and would alleviate the need to "pay eight hours of overtime on a Saturday to cover a two hour time slot in Bulk Mail when Ms. Koger is not working"; he also proposed that he could cover lunch relief and closing duties, as well as do "faxes, passports, certified letters, distribution work, etc." *Id*. He wrote: "[a] start time of 10 or 11 AM Monday through Friday and an 8 AM start time on Saturday would fill this need." *Id*.

The Postmaster agreed that another bid could be justified and created a new bid position to have a regular employee provide relief to the regular widow clerks during their lunch breaks and then to work at the registry cage, where clerks account for items

the post office must track (registered letters, scanners and other items the mail carriers must sign for when they come and go). Mr. Salisbury bid for this new position, and, on November 21, 2003, the Postal Service issued a notice announcing that his bid had been successful. *See* Defendant's Rule 56.1 Statement, Exhibit J. That notice described the job as follows:

> Working from the Main Office
> 11:00 A.M. to 7:30 P.M. Mon., Tues., Wed., and Fri.
> 6:30 A.M. to 3:00 P.M. Sat.
> Work week of Monday through Friday
> Sun and Thurs. fixed days off
> Registry Cage relief and Window Relief
> Scheme knowledge required
> Successful completion of Sales and Service Associate Training required
> New position

Exhibit J. Although the Saturday hours were initially set as defined in the notice, effective April 2, 2005, Mr. Salisbury's Saturday schedule was changed; instead of coming in at 6:50 a.m. and leaving at 3:00 p.m., he was required to come in at 10:50 a.m. and leave at 7:00 p.m. *See* Defendant's Rule 56.1 Statement, Exhibit O. His schedule was otherwise unchanged.

According to the Postal Service, shortly after starting in the new position, Mr. Salisbury began to complain. He complained that his supervisor, Kathy Carter, required him to rotate from window to window when providing lunch relief for the regular clerks; he complained that Ms. Carter required him to perform relief in the registry cage, a job that he found to be less desirable than widow duties; he complained that customer service

3

supervisor Keith Sahs chose someone other than him to train a new employee on the window; he complained that he was not given bulk mail assignments or the opportunity to work at the downtown Joliet facility instead of the main office; and he complained that, on one occasion, Ms. Carter called him "ma'am" and that, on another occasion, she referred to a group of clerks (all female except Salisbury) as "ladies."

Mr. Salisbury initiated EEO proceedings on these complaints in August 2004. On a postal service form for "pre-complaint filing counseling," Mr. Salisbury alleged sex discrimination and retaliation. *See* Defendant's Rule 56.1 Statement, Exhibit M. To support his discrimination claim, Mr. Salisbury alleged that no female window/distribution clerk was taken off her window and replaced by a PTF; he also alleged that female clerks routinely worked outside their assignments and bids. *Id.*, p. 2. He alleged that, in contrast, he was taken off the window each day, replaced by a PTF, and ordered to work at the registry cage; he alleges that he asked to speak with the postmaster, Richard Bassi, about the issue, and that Mr. Bassi told him that Salisbury's supervisor, Kathy Carter, wanted to have the same person working in the registry cage every day. *Id.* He also alleged that he was required to know all the window functions, whereas female window clerks were not. *Id.*, p. 2. He also claimed that female clerks (specifically Priscilla Smith and

Audrey Rafter) were "allowed to work at the downtown station even though it is not on their assignment or bid," but that he had not "been given the same consideration"; and that female clerks were given "bulk mail job assignments," while he was not. *Id.*, p. 3 He claimed that he was an "on the job trainer," but was "never considered for this higher level assignment." *Id.*, p. 3. He also complained because he was required to move from window to window to provide lunch relief. *Id.*, p. 3.

Mr. Salisbury complained that Kathy Carter "harasses me every chance she gets"; he contended that Ms. Carter addressed the window clerks as "ladies" even though he was among the group; he acknowledged that Ms. Carter apologized when he complained about it and that she told him it would not happen again; but he alleged that she then referred to the group as "clerks" but in a way that emphasized that she is not calling them "ladies." *Id.*, pp. 3-4. He also noted that he was the only male window or widow/distribution clerk in the building. *Id.*, p. 4.

Mr. Salisbury filed a formal EEO Complaint on October 13, 2004. The United States Equal Employment Opportunity Commission investigated his claims and assigned the matter to an Administrative Judge, who found no discrimination and issued a decision in favor of the Postal Service. Mr. Salisbury pursued an unsuccessful appeal of that decision, with the EEOC issuing a final decision and right-to-sue notice on March 1, 2007.

In the meantime, Mr. Salisbury filed additional EEO charges in early and mid-2005. On the "pre-complaint counseling" form dated March 25, 2005, he complained that he was taken off his window and replaced by PTF(s) and that he was assigned to work in the registry cage, even though PTFs were available for that work. *See* Defendant's Rule 56.1 Statement, Exhibit N, p. 1. He also complained that his Saturday start time was pushed back four hours. *Id.*, pp. 1-2. He also contended that Ms. Carter is "intent on harassing me and retaliating against me because of my EEO case." *Id.*, p. 2. Mr. Salisbury filed a formal EEO Complaint on May 2, 2005. Once again, an Administrative Judge entered summary judgment in favor of the postal service. Mr. Salisbury pursued an unsuccessful appeal of that decision, and the EEOC issued a final, unfavorable decision, along with a right-to-sue notice, on August 16, 2007.

On September 6, 2007, Mr. Salisbury filed a federal action in this Court, alleging sex discrimination, in violation of Title VII, and retaliation. The case is currently before the Court on the Postal Service's motion for summary judgment.

<u>Discussion</u>

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56©; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive summary judgment, the non-moving party must offer more than "mere conclusory" allegations. *Nowak v. St. Rita High School,* 142 F.3d 999, 1002 (7th Cir. 1998). *See also Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (the non-moving party must offer more than a "metaphysical doubt as to the material facts"). The non-moving party will lose on summary judgment if he cannot present sufficient evidence to support each element of his case for which he will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. And the Court will disregard all facts not properly supported by the record. *Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7th Cir. 1997).

In his complaint, Mr. Salisbury claims that the Postal Service subjected him to

> wrongful discrimination base[d] upon his sex (male) and has subjected [him] to illegal retaliation and reprisal for protected EEOC activity by a series of illegal actions including adverse work assignments, denial of temporary promotions and higher pay activities, refusal to accord him preferential work assignments customary for workers of his rank and seniority and creating a hostile work environment. Defendant has created the hostile work environment by a series of actions including but not limited to addressing Plaintiff

individually or while in a group as a female rather
than a male; denying Plaintiff, the only male clerk in
his work unit, normal custom and practice prerogatives
in preferential work assignments and forcing Plaintiff
to do useless tasks, such as needlessly rotating among
Window Clerk/Customer Service work stations when one or
more of the stations are empty and there is no
operational justification for this rotation during
Plaintiff's work shift.

Complaint, ¶2.

Specifically with respect to his sex discrimination claim,
Mr. Salisbury alleges that "[b]eginning in and around December 1,
2003, Defendant took Plaintiff off window duty on a regular
basis"; that "Defendant required him to be knowledgeable and
proficient in all skills incident to Window Duty"; that he was
denied the opportunity to work Window Duty assignments at the
downtown Joliet Post Office; that Defendant denied him the
opportunity to work Bulk Mail assignments; that he was denied the
opportunity to work as a trainer; and that "on or about October
6, 2004, Defendant subjected Plaintiff to a harassing
discriminatory and retaliatory environment by his immediate
supervisor addressing him as 'Ma'am' and on another occasion
using the word 'Ladies' to address all of the Window Clerks in
the Plaintiff's work unit, including Plaintiff." Complaint, ¶16-
22.

To survive summary judgment on his discrimination claim, Mr.
Salisbury must prove that he "is a member of a protected class,
that he was meeting his employer's legitimate expectations; that

he suffered an adverse employment action, and that similarly situated individuals were treated more favorably than he was." *Farr v. St. Francis Hospital and Health Center*, 570 F.3d 829, 833 (7th Cir. 2009). *See also, e.g., Grube v. Lau Industries, Inc.*, 257 F.3d 723, 728 (7th Cir. 2001)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If Mr. Salisbury succeeds in establishing a *prima facie* case of discrimination, the Postal Service then bears the burden of producing a legitimate nondiscriminatory reason for the adverse employment action. *Grube*, 257 F.3d at 728 (citing *Christensen v. Equitable Life Assurance Soc. of the United States*, 767 F.2d 340, 343 (7th Cir. 1985)). If it offers a legitimate reason, Mr. Salisbury bears the ultimate burden of persuading the Court that the Postal Service's stated reason was merely a pretext. *Grube*, 257 F.3d at 728.

The Postal Service has not challenged Mr. Salisbury's status as a member of a protected class, and there appears to be no question that he was meeting his employer's expectations. Indeed, at his deposition, the Postmaster, Richard Bassi, testified that Mr. Salisbury "does an excellent job in whatever he does so far as what I can tell and so far as what I've been told from the supervisors he performs for." Bassi Dep., p. 44. Keith Sahs testified at his deposition that Mr. Salisbury "is very efficient and very thorough no matter what duties he's

performing." Sahs Dep., p. 37. In fact, on a scale of 1 to 10, with 1 being the lowest and 10 being the highest, Mr. Sahs gave Mr. Salisbury a 9 for overall performance. *Id*.

The Postal Service argues, however, that Mr. Salisbury cannot establish that he suffered an adverse employment action. Nor, it argues, can he establish that similarly situated employees were treated more favorably. The Court considers each argument in turn.

In his complaint, Mr. Salisbury alleges that he suffered a variety of adverse actions: he alleges that he was taken off the window bid and required to work in the registry cage; he alleges that he was denied the opportunity to provide employee training; he alleges that he was directed to move from station to station when providing lunch relief for the regular window clerks; and he alleges that his Saturday schedule was changed. As the Seventh Circuit has explained – and as employer's often like to note in discrimination cases, "not everything that makes an employee unhappy" constitutes an adverse employment action. *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). "[A]ctionable discrimination must involve a "materially adverse employment action," which is "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crews v. City of Mt. Veron*, 567 F.3d 860, 869 (7th Cir. 2009)(citing *Maher v. City of Chicago*, 547 F.3d 817, 824 (7th

Cir. 2008) and quoting *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 780 (7th Cir. 2007)).

"There are three general categories of materially adverse actions that can support a Title VII claim: (1) cases in which an employee's compensation, benefits or other financial terms of employment are diminished; (2) cases in which a transfer to a lateral position prevents an employee from using his skills and experience, thereby dimming the employee's career prospects; and (3) cases in which a change in working conditions subjects an employee to a humiliating, unsafe, or otherwise significantly negative alteration in the employee's workplace environment." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009); *see Herrnreiter v. Chicago Hous. Auth.,* 315 F.3d 742, 743-45 (7th Cir. 2002)). For the most part, the first two do not apply. Mr. Salisbury does allege that the Postal Service's decision to deny him the opportunity to serve as a trainer did cause him to lose out on additional pay. But he does not allege that his pay, benefits or career prospects were diminished.

Presumably seeking to bring his case within the third category, Mr. Salisbury has argued that he is frequently humiliated because he is required to move from station to station to provide lunch relief; he claims that, because each station is different, he often has to look in several drawers before finding forms and tools he needs, which makes him look stupid to

customers.  *See* Plaintiff's Rule 56.1 Statement, Exhibit 70.
Accepting this evidence at face value (summary judgment is not a
time for credibility determinations), Mr. Salisbury's
"humiliation" does not rise to the level contemplated by the
cases – no jury could reasonably find that this minor
embarrassment amounted to a "significant negative alteration" of
Mr. Salisbury's workplace environment.

"An adverse employment action must be materially adverse,
not merely an inconvenience or a change in job responsibilities."
*Crews*, 567 F.3d at 869; *Griffin v. Potter,* 356 F.3d 824, 829 (7th
Cir. 2004).  "An adverse employment action is one that
significantly alters the terms and conditions of the employee's
job"; examples include termination, demotion accompanied by a
decrease in pay, or a material loss of benefits or
responsibilities, but do not include 'everything that makes an
employee unhappy.'"  *Crews*, 567 F.3d at 869 (quoting *Lapka v.
Chertoff,* 517 F.3d 974, 986 (7th Cir. 2008)).  Mr. Salisbury's
complaints fall squarely within the latter camp, and no
reasonable jury could find otherwise.

Notably, Mr. Salisbury is not complaining about the original
decision to "excess" his position – he is not alleging that that
decision had anything to do with sex discrimination or
retaliation.  And, ironically, the decision to post him to the
bid assignment that has made him so unhappy was made after he was

excessed and after he submitted a proposal to create a new bid assignment - which included, by his terms, providing relief to the window/distribution clerks who were on lunch break. The position - which he bid on and which he voluntarily accepted - by its terms entailed both relief for window clerks and for the registry cage duties. He may not like the way his supervisors implemented those duties or the way in which his employer required him to perform those duties. But they do not rise to the level of adverse employment actions.

Certainly, having to rotate from window to window falls squarely within the "minor alteration of job responsibilities" and "mere inconvenience" camp. And although Mr. Salisbury found the process to be inefficient and inconvenient, Edward Andrade testified that he similarly performed window relief duties and that he would rotate from window to window to cover for window clerks who were taking lunch breaks; he testified that it took "a minute or two at the most" for a window clerk to pull out the cash drawer, lock it up, and prepare the window station for him to step in. Andrade Dep., p. 34. He further testified that it took "one minute" for him to assume the window station. *Id.*, pp. 34-35. That transition required him to "log on to the POS, open the drawer put my cash drawer [in], close the POS, and ask the customer if I can help them." *Id.*, p. 35.

Similarly, having to work in the registry cage rather than

at a window – in addition to being part of Mr. Salisbury's bid
assignment – does not amount to an adverse employment action.  On
this point, Mr. Salisbury's own words are particularly telling:
with regard to the requirement that he work in the registry cage,
Mr. Salisbury stated in a November 9, 2009 affidavit that he
"perceived the requirement to account and sign for controlled and
valuable items, and to stay involuntarily until all postmen
returned from duty, as more stressful and less desirable than
normal window duty, and therefore a meaningful and valuable
benefit to my Saturday work assignments and schedules was
exclusive window duty."  Salisbury Affidavit, ¶1(e) (attached as
Exhibit 7 to Plaintiff's Rule 56.1 Statement).

This is really the crux of this case: Mr. Salisbury quite
simply did not want to do the registry cage work; he wanted to be
exclusively assigned to window duty.  And yet, that is not what
his bid assignment called for, that is not the position he was
offered and that is not the position he accepted.  The Postal
Service did not discriminate against Patrick Salisbury because of
his sex when it required him to work in the registry cage rather
than at a window; it merely held him to the bargain he made when
he accepted the bid.  It is true that "an ostensibly lateral
transfer may be an adverse employment action in some situations
if it is accompanied by a 'dramatic downward shift in skill level
required to perform job responsibilities.'"  *Hoffman-Dombrowski*

*v. Arlington International Racecourse*, 254 F.3d 644, 651 (7th Cir. 2001)(quoting *Dahm v Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) and citing *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1112 n.7 (7th Cir. 1998)). But Mr. Salisbury has not established (or even alleged) that such circumstances existed here.

The Court also rejects Mr. Salisbury's argument that the Saturday schedule change amounted to an adverse employment action. Again, Mr. Salisbury's testimony is telling: he testified that he preferred going to church on Saturday evening, as opposed to Sunday morning, because "it works for me and my schedule"; he testified that he "reserve[s] Sunday for different things that I do with family and friends, and so this works out best for me spiritually, and it works out best for me – you know, for me to get everything that I need to get done – In order to get everything that I need to get done and plus still be able to worship how I want to worship." Salisbury Dep., p. 66. Mr. Salisbury testified that he usually likes to do things like family gatherings, projects around the house, visiting a friend's grave, etc. on Sundays and his work schedule now causes conflicts with these things. He testified that, since his schedule changes in April of 2005, he has had to switch from attending mass on Saturday evenings to attending mass on Sunday mornings, which causes conflicts with his other activities, projects and

appointments. Salisbury Dep., pp. 4-8. This is strong evidence that the matter was one of inconvenience, not material adversity. And inconvenience is not enough to make it an adverse employment action under Title VII. *See, e.g., Grube v Lau Industries, Inc.,* 257 F.3d 723, 728-29(7th Cir. 2001) (transfer to the less desirable second shift did not amount to an adverse employment action).

To bolster his claim that the change in his Saturday shift constitutes an adverse employment action, Mr. Salisbury also submitted an affidavit from his uncle, a priest, who states that Mr. Salisbury is a "deeply religious person with sincere spiritual beliefs." *See* Affidavit of Father Michael Flynn, ¶4 (attached as Exhibit 15 to Plaintiff's Rule 56.1 Statement). He states that the change in Mr. Salisbury's schedule has prevented him from attending mass on Saturday evening, as was his practice prior to the schedule change; he states that Mr. Salisbury is now required to attend mass on Sunday mornings; he states that Mr. Salisbury's prior practice of attending mass on Saturday evening allowed him to celebrate in a particularly significant way mass and communion, because Saturday evening marked the "stress-free end of his personal week." *Id.,* ¶6. Father Flynn notes that, in his experience, parishioners habitually attend a particular mass each week, which allows them to engage in community worship, with the people attending mass with them taking on a "special value"

and ensuring an expression of "their religious community worship." *Id.*, ¶5. Indeed, Father Flynn goes so far as to say that he "cannot imagine that [Mr. Salisbury] could not be transferred to another time slot, since he has had it before." *Id.*, ¶10©. With due respect to Father Flynn, his opinion on this issue counts no more than Mr. Salisbury's. Decisions concerning scheduling and staffing matters are left to management (here, with input where appropriate from the Union). What Mr. Salisbury's uncle and priest can or cannot imagine has no bearing on the question of whether his schedule change amounted to an adverse employment action within the meaning of Title VII.

Moreover, even if Mr. Salisbury could show that he suffered some adverse employment action, his claim would still fail because he cannot show that similarly-situated female or non-Catholic employees were treated more favorably; nor has he offered anything to suggest that there was something "fishy" going on at the Postal Service. *See Farr v. St. Francis Hospital & Health Centers*, 570 F.3d 829, 833 (7th Cir. 2009). Indeed, Mr. Salisbury has not identified any other female employee or non-Catholic employee who was similarly situated – certainly in terms of a bid assignment, as Mr. Salisbury's bid was, even by his own admission, unique and novel. Nor in terms of seniority, as Mr. Salisbury was, by his own admission, the most junior member of the window clerk group. Mr. Salisbury has emphasized that he was

the only male employee included in the group of window/distribution clerks. But, without more, that is not evidence of discrimination.

Just as significantly, the Postal Service has offered legitimate, non-discriminatory reasons for each of the decisions challenged by Mr. Salisbury. And he has offered nothing to show that the Postal Service's stated reasons are a sham.

With regard to Mr. Salisbury's complaint that he was not afforded the opportunity to train new employees, in her EEO affidavit, Ms. Carter explained that she used Joan Welsh, and not Mr. Salisbury, as an on-the-job trainer because her schedule matched the training needs; Ms. Carter stated that "[t]raining normally occurs on five consecutive days, Monday through Friday, eight hours each day" and that Ms. Welsh "works the window eight hours a day, Monday through Friday," whereas Ms. Salisbury has Tuesdays off and does not begin work until 11 a.m." Defendant's Rule 56.1 Statement, Exhibit K. With regard to his complaint that he was not afforded the opportunity to work at the downtown post office, Ms. Carter explained that employees are assigned duties in accordance with their bid assignments; some bid assignments provide for such mobility, others do not, and Mr. Salisbury's did not.

Similarly, with regard to his argument that he was not offered bulk mail duties, Ms. Carter testified that such duties

were not included in his bid assignment, and the bid itself makes
that clear.  Keith Sahs, Ms. Carter's manager, confirmed Ms.
Carter's statements concerning the assignment of bulk mail duties
and training duties.  Defendant's Rule 56.1 Statement, Exhibit L,
p. 1.  Mr. Sahs stated that Mr. Salisbury's bid assignment

> is essentially a lunch replacement and window back-up.
> He is the only clerk with this bid assignment, which he
> and the Postmaster agreed on.  He begins work at 11
> a.m. and works at the window while the regular window
> clerks take their lunch breaks.  When they return from
> lunch, [he] assists the registry cage clerk handling
> accountable mail items, and he finishes the registry
> cage work when the clerk leaves.  This is an important
> job and management prefers to have consistency in the
> assignment.

Defendant's Rule 56.1 Statement, Exhibit L, p. 2.

With regard to the change made to Mr. Salisbury's Saturday
schedule, Mr. Sahs stated that religion never came into play;
rather, the decision to change that schedule was based upon "the
needs of the service and operation, job bids, necessary skills,
qualified or qualifications of employees and contractual
guidelines."  Defendant's Rule 56.1 Statement, Exhibit R, p. 2.
In other words, Mr. Sahs confirmed that the things about which
Mr. Salisbury complained were the result of legitimate management
prerogatives.

The change to Mr. Salisbury's schedule was apparently
initiated at the suggestion of Rita Postel, who served as the
supervisor of mail processing at Joliet beginning around July 4,
2004, *see* Postel Dep., p. 21.  The record includes a November 5,

2004 email from Ms. Postel to Richard Bassi suggesting, among other things, that Mr. Salisbury should "work from 11:00 - 7:30 every day, including Saturday, to minimize using PTF's for the cage." *See* Defendant's Rule 56.1 Statement, Exhibit P. The email includes approximately 10 other clerk schedule changes, and this is the only one affecting Mr. Salisbury. *See Id.* At her deposition, Ms. Postel testified that, in response to an email she received from the postmaster asking for suggestions for ways to change the operation to make it more successful, she "sent a proposal to him [Rick Bassi] about mail processing clerks, registry clerks, window clerks and just my thoughts on what type of hours I thought would help the operation of the business." Postel Dep., p. 22. She testified, consistent with the email, that proposal included the suggestion that Mr. Salisbury's Saturday schedule be changed from an end time of approximately 3:30 p.m. to an end time of approximately 7:00 p.m. Postel Dep., pp. 21-22. Ms. Postel testified that she felt there needed to be "a regular . . . in that cage on Saturdays. It did not have to be Mr. Salisbury, it could have been any window position, which is what I used to have when I supervised the windows, I had two people that were trained, and they closed every other Saturday, one of them closed the cage." Postel Dep., p. 60. She testified that management wanted a regular in the cage "for stability, consistency." *Id.*

Richard Bassi, Postmaster of the Joliet Post Office,

supports that; in his affidavit, he explains that Mr. Salisbury's

> bid assignment calls for him to work "Registry Cage
> relief and Window Relief." . . . The work hours of this
> bid originally called for the employee to have non-
> scheduled days of Sunday and Thursday and work a
> schedule of 11 AM to 7:30 PM on each work day except
> Saturdays.  On Saturdays the schedule was posted as
> 6:30 AM to 3 PM.  The assignment in question was a
> newly created position awarded to [Mr. Salisbury] in
> November 2003.  The change in the start time for the
> Saturday part of the schedule was the result of
> consultations between the various clerk supervisors and
> the Union leadership including the Local President.
> After much debate at the time of the posting, it was
> determined to post the bid with the earlier Saturday
> start time so that this bid assignment could assist the
> mail processing operation early and then report to
> Window Service duties.

> In December of last year [2004], a review of all
> clerk bid assignments and scheduling practices was made
> at my instruction and based on operational needs.
> Again each clerk supervisor along with the Local Union
> President and another officer participated in the
> review.  Many suggestions for change were discussed and
> management ultimately decided to make schedule changes
> on numerous bid assignments.  It was agreed with the
> Union President that only the changes that would not
> require assignments to be reposted, in accordance with
> the Collective Bargaining Agreement, would be made
> initially.  The schedules of nine assignments were
> changed effective January 15, 2005 and the employees
> wee notified. . . . The change to [Mr. Salisbury's]
> schedule was also planned at that time but there was
> some uncertainty as to whether or not the proposed
> change would result in a contractual obligation to
> repost the assignment.  It was agreed to delay the
> schedule change on [Mr. Salisbury's] assignment while
> both management and the Union researched the issue and
> contacted their respective support people for opinions
> on the issue.  The Local President eventually stated
> that he was informed from his Business Agent's office
> that there would be no need to repost the bid.  The
> supervisors and the Manager, Customer Services
> concluded that for operational reasons it would be wise

> to effect the change to [Mr. Salisbury's] schedule and
> inquired if I had any objection to the change.  I had
> no objection and concurred with the logic of the
> change.  The Union was notified, [Mr. Salisbury] was
> notified and the change was made.

*See* Defendant's Rule 56.1 Statement, Exhibit Q, pp. 1-2.

Mr. Bassi testified that he is a proponent of having the regular window people stay in their regular spots and having the relief person rotate from window to window; he testified that things have worked that way in every office he's been in charge of; he also testified that, if they had an open window, one that was going to remain empty all day, he thought it would be reasonable to have the relief person operate out of that window, without moving around.  Bassi Dep., pp. 27-28.

Mr. Bassi also testified that the Saturday change was "clearly part of a overall scheduling review and revamping . . ." he testified that, "in large part, these are just regular day-to-day management operational decisions that were being made . . . ."  Bassi Dep., p. 68.  He testified that "[m]anagement is responsible for scheduling of employees, and that's what we did in this case."  *Id.*, p. 69.

Kathy Carter testified that she and the other supervisors had "discussed the need to have the cage manned during Saturdays" and that "Rita Postel suggested that since Mr. Salisbury was the cage relief person and closed the cage weekdays, when he was here, that it would make sense to have him work and close the

cage on Saturday, thus alleviating her problem of scheduling someone to do that." Carter Dep., p. 74. She testified that the decision to change Mr. Salisbury's Saturday schedule was made by the postmaster, at the time, Richard Bassi; but she testified that she concurred with the change "[b]ased on the need to have the cage manned by someone who was well trained and someone who would do it every week and would not be — it would not be a matter of well, who's in the cage this week, it would be a permanent position, someone to do it regularly." Carter Dep., p 75. She testified that Ms. Postel "felt that his use in the cage Saturday would be more beneficial to the postal service than what we were seeing on this original bid"; [t]hat work that would be done in the morning could be done by someone who was already at the mail processing position, and that we would have a regular person assigned to the cage on Saturdays." Carter Dep., p. 87.

Keith Sahs testified that "we had had several conversations involving a multitude of the different employees and operational needs and work schedules, and she had made mention about Pat's Saturday schedule and the duties that he performed and some of the needs of the operation." Sahs Dep., p. 27. He testified that Ms. Postel "figured it would be beneficial operationally to make some changes to Pat's schedule on Saturday"; in terms of the benefits, he testified that "[t]he biggest things were having some consistency in the registry cage, the availability to clear

and process people in our delivery operation efficiently, the possibility of being able to utilize our PTF's more efficiently in other areas at different time frames of the operation and day. Sahs Dep., p. 27.

Ms. Carter explained that the changes to Mr. Salisbury's schedule were made, as part of a whole host of changes, in response to concerns Rita Postel had expressed concerning difficulty she was having covering the cage on Saturdays. Carter Dep., p. 83 (attached as Exhibit 36 to Plaintiff's rule 56.1 Statement). Carter testified that, at staff meetings, Rita Postel "expressed her troubles in trying to work a schedule out to cover the cage on a Saturday." Carter Dep., p. 73 (attached as Exhibit 36 to Plaintiff's Rule 56.1 Statement). She testified that "Rita Postel suggested that since Mr. Salisbury was the cage relief person and closed the cage on weekdays, when he was here, that it would make sense to have him work and close the cage on Saturday, thus alleviating her problem of scheduling someone to do that." Carter Dep., p. 74 (Ex. 36).

Mr. Sahs explained that, as he recalled, Ms. Postel believed changing Mr. Salisbury's Saturday schedule would be beneficial to the Postal Service in that it would bring "some consistency in the registry cage" and ensure "the availability to clear and process people in our delivery operation efficiently," allow for "the possibility of being able to utilize our PTF's more

efficiently in other areas at different time frames of the
operation and day.  Sahs Dep., p. 27 (attached as Exhibit 38 to
Plaintiff's Rule 56.1 Statement).  Mr. Sahs testified that
Salisbury's hours were changed sometime in 2005, when they "made
several changes."  *Id.*, p. 28.  He testified that, prior to
implementing the change in Mr. Salisbury's schedule, he was aware
that delivery supervisors often complained about the confusion
and a lack of expedience in the performance of the cage duties,
which delayed the process of clearing the carriers for the day.
*Id.*, p. 30-31.

When pressed as to why Ms. Postel could not simply use PTFs
to cover the cage, Ms. Carter explained that the PTFs are
flexible and guaranteed only 4 hours on Saturdays, so if there
was no work for them, they could be sent home, without pay,
thereby saving the Postal Service money; in contrast, she
explained, Mr.  Salisbury was a regular employee, guaranteed 8
hours of work on Saturdays, so it made sense to ensure that he
was provided with 8 hours of work.  Carter Dep., pp. 83-84
(attached as Exhibit 36 to Plaintiff's Rule 56.1 Statement).

All of this evidence establishes that the Postal Service had
legitimate, non-discriminatory reasons for assigning Mr.
Salisbury to the registry cage, for changing his Saturday
schedule, and for denying him certain duty opportunities.  And
there is nothing in the record to suggest that the reasons

offered by the Postal Service are in any way pretextual. Mr. Salisbury has submitted an affidavit and an excerpt from a "log" he kept, both of which state that he was being retaliated against and discriminated against. But those are simply statements of his feelings and opinions; there is no evidence to back them up.

On the issue of pretext, Mr. Salisbury makes several arguments, none of which are persuasive. First, Mr. Salisbury has emphasized that management made no effort to discipline or retrain the PTFs that were causing the delays and other problems in the registry cage and that it chose instead to assign him to the cage and to change his schedule so that he could close each night. But Mr. Salisbury has offered nothing to establish that it had any obligation to do so; nor does he explain why choosing the latter option, rather than the former, establishes discrimination. That management chose to handle the registry cage problems by placing a regular employee in the cage – the same regular employee who closed the cage four other nights of the week – would seem to be quite reasonable and logical. Indeed, Mr. Salisbury admits that, when he bid on the new position, the words "registry cage relief" and "window relief" were included in the bid. Salisbury Dep., p. 35. Thus, it is hardly surprising that he was expected to perform these duties. He also admits that he was the "most junior regular full-time window/distribution clerk," and he admitted that he "got a brand

new bid that [he] pushed for in November of '03" Salisbury Dep.,
p. 93. Thus, it would hardly be surprising if he were held to
different standards or different expectations.

Also on the issue of pretext, Mr. Salisbury has offered
evidence showing that a number of schedules were changed
effective January 15, 2005, but that only his schedule was
changed so dramatically. *See* Plaintiff's Rule 56.1 Statement,
Exhibit 59. The evidence shows, for example, that Kathleen
Butler's starting and ending times were moved up 50 minutes;
Dwayne Charp, Sally Tatroe and Nadine Puralewski had their
starting and ending times moved up one hour; Opal Boozer's
starting and ending times were moved back 50 minutes; Mario
D'Andrea, Joan Horn and Versie Ward had their start times moved
up 50 minutes and their end times moved up 10 minutes; and Denise
Rodgers had her start time pushed back 50 minutes and her end
time pushed back 10 minutes. *Id.* Yet Mr. Salisbury had his
start and end times pushed back 4 hours. *See* Defendant's Rule
56.1 Statement, Exhibit O. The difference does, at first blush,
seem to be significant. But the fact of the matter is that the
other employees' schedules were changed on a daily basis, whereas
Mr. Salisbury's schedule remained the same four out of five of
his assigned work days; only his Saturday schedule was changed.
The overall effect, therefore, was roughly the same for all of
the employees impacted by management's schedule changes.

Of course, change can be disruptive. And the Court does not doubt that the change in Mr. Salisbury's Saturday schedule brought unwanted change in his weekly routines, including his church attendance. But that is not evidence of discrimination. There is no evidence to suggest that the Postal Service changed Mr. Salisbury's schedule because of his sex or because of his religion – on the contrary, Ms. Carter and Mr. Sahs both testified that they had no idea he was Catholic and no idea he regularly attended mass on Saturdays. The Postal Service offered legitimate, non-discriminatory reasons for changing his schedule – that management wanted stability and consistency in the registry cage, with the same person performing closing duties – and Mr. Salisbury has offered no evidence to discredit or otherwise undermine those reasons. The fact that he preferred to attend Saturday evening mass does not make this into a federal case.

One last point on Mr. Salisbury's sex discrimination claim: he has alleged that certain comments by Ms. Carter gave rise to a hostile work environment. To win on a hostile environment claim, Mr. Salisbury would have to show that his work environment was both subjectively and objectively hostile. *E.g., Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). But Mr. Salisbury has alleged, at most, a couple of rather benign comments: he alleges that Kathy Carter, once referred to him as

"ma'am," and once referred to a group of clerks (all female, other than Mr. Salisbury) collectively as "ladies." He also alleges that, although Ms. Carter apologized for referring to the group as "ladies," she later referred to the group as "clerks" but with a tone of voice that made it clear she was doing it because of him. Even if Ms. Carter's comments could be characterized as negative and offensive (unlikely from an objective standpoint), they were not by any measure severe or pervasive, and they are not, therefore, enough to support a hostile environment discrimination claim. *E.g., Crews*, 567 F.3d at 870 (negative employer comments will support a Title VII claim only if they are 'severe and pervasive.'")(citing *Griffin* v Potter, 356 F.3d 824, 829 (7th Cir. 2004)).

Having said all of this, there may well be something to Mr. Salisbury's claim that Ms. Carter harassed him every chance she got - certainly, it is clear from the tenor and substance of her November 28, 2005 EEO affidavit that she thought he was a know-it-all and was annoyed with his persistent reluctance and refusal to follow management's directives. But disliking an employee is not - even treating some employees worse than others is not - in and of itself, illegal. The law protects employees from such differential treatment only if it is based upon some illegal criteria. And, other than Mr. Salisbury's conclusory statements, there is no evidence that Ms. Carter's attitude stemmed from Mr.

Salisbury's gender, from his religion, or from any other illegal criteria. Accordingly, the Court finds that Mr. Salisbury's discrimination claim must fail.

The Court turns next to Mr. Salisbury's retaliation claim. To be sure, "Title VII forbids an employer from discriminating against an employee who has 'opposed any practice' made unlawful by Title VII or who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Scruggs*, 587 F.3d at 838 (quoting 42 U.S.C. § 2000e-3(a)). The requirements for a retaliation claim are the same as those spelled out above: to prove retaliation Mr. Salisbury must show that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Scruggs*, 587 F.3d at 838 (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *Kodl v. Bd. of Ed., School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007). As above, if he succeeds in passing this initial hurdle, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for its action, and, if the defendant does so, he would then have to show that a genuine issue of material fact exists as to whether the defendant's

proffered reason was pretextual. *Scruggs*, 587 F.3d at 838

(citing *Stephens,* 569 F.3d at 787; *Fischer v. Avanade, Inc.*, 519

F.3d 393, 408 (7th Cir. 2008); *Argyropoulos*, 539 F.3d at 736).

"[A]n employee's failure to cast doubt on an employer's

nonretaliatory explanation" means a claim fails under either the

direct or indirect method. *Argyropoulos*, 539 F.3d at 736 n. 6.

Because the claims have the same elements, and because Mr.

Salisbury relies upon the same evidence to support both claims,

the Court's analysis above applies with equal force to this

claim. His retaliation claim fails for the same reason his

discrimination claim fails: the evidence, regardless of which

claim it is intended to support, does not establish that Mr.

Salisbury suffered an adverse employment action. Moreover, even

if he could show that having to work the registry cage, having to

rotate from window to window to provide lunch relief, or having

his Saturday schedule adjusted did amount to an adverse

employment action (and he cannot), his claim would still fail

because he has offered no evidence linking those adjustments or

requirements to his EEO activity.

Mr. Salisbury has attempted to rely on a suspicious timing

argument. But he filed his formal EEO complaint in August 2004,

and he filed his second formal EEO complaint in May 2005; he

wrote the proposal for the new position June 6, 2003 and formally

won the bid November 29, 2003; and he testified that he started

rotating from window to window and was assigned to the registry cage within a week of starting that position – long before he had filed any EEO charges. Moreover, the memo announcing his Saturday schedule change was written March 28, 2005 and the schedule was supposed to take effect April 2, 2005 – both before he filed his second charge and long enough after he filed his first charge so as not to be suspicious.

## Conclusion

For the reasons set forth above, the Court finds that Mr. Salisbury cannot make out a *prima facie* case of discrimination; nor can he make out a *prima facie* case of retaliation. The Court, therefore, finds that summary judgment in the defendant's favor is appropriate and, accordingly, grants the Postal Service's motion for summary judgment [#65].


Date: March 26, 2010

ENTER:

ARLANDER KEYS
United States Magistrate Judge

32